ATTORNEY GRIEVANCE COMMISSION OF
MARYLAND *v.* VICTOR LEROY EDWARDS

[Misc. Docket (Subtitle BV) No. 8, September Term, 1978.]

*Decided April 2, 1979.*

*James E. Kenkel, Special Assistant Bar Counsel,* for Attorney Grievance Commission.

Submitted on exceptions by *Victor LeRoy Edwards.*

PER CURIAM.

The Attorney Grievance Commission, acting through Bar Counsel, filed a petition for disciplinary action against Victor LeRoy Edwards, alleging violation of the Disciplinary Rules of the Code of Professional Responsibility, and specifically Disciplinary Rules 1-102 and 7-102. We referred the charges to the Circuit Court for Prince George's County to be heard and determined by a three-judge panel in accordance with the then applicable Maryland BV Rules. The panel, after conducting an evidentiary hearing, made findings of fact from which it concluded that Edwards had violated the disciplinary rules as charged. It recommended disbarment.

Edwards filed exceptions to the panel's findings of fact and recommendation of disbarment. The exceptions were based on an alleged lack of legally sufficient evidence to support the panel's factual findings and to justify its recommendation of disbarment. We scheduled the matter for oral argument on Edwards' exceptions, but he failed to appear in support of his position.

We have given careful consideration to Edwards' exceptions. Clearly, there was legally sufficient evidence to support the panel's findings of fact, and we adopt and include them in this opinion.

"* * *

"Victor LeRoy Edwards, respondent, was admitted to the Bar of the State of Maryland in November, 1960 and practiced in this state until September of 1974. In the spring of 1974, respondent was retained by a Mrs. Mary Hayes (Hayes) to investigate the possibility of getting necessary legislative and administrative approval for the

construction of a new hospital facility in the area of Clinton, Maryland, a southern portion of Prince George's County. At that time, Hayes was the majority stockholder in the Clinton Community Hospital Corporation (Clinton Hospital), a small private hospital in Clinton, Maryland.

"Respondent and Hayes both realized that they had formidable problems to overcome in that all necessary authorization and permits needed for the construction of the hospital had already been procured by Frank P. Chiaramonte, M.D. (Chiaramonte), part owner of the Southern Maryland Hospital Center (Southern). Inasmuch as only one new hospital facility was to be built, it was apparent to respondent that his task was rather dubious from the start. This task was to somehow discredit Chiaramonte or Southern so that the permits and authorization received by Chiaramonte to construct the hospital might be transferred to Hayes.

"Initially, respondent contacted Mr. Jerris E. Bragan (Bragan), a private investigator with whom he had dealt on previous business matters. Sometime in the latter part of June, 1974, respondent asked Bragan if he could arrange to have an operative placed in Chiaramonte's office. Bragan would receive a Seven Hundred and Fifty Dollars ($750.00) fee for this service. He earned his fee by getting employment for his wife in Chiaramonte's office. Mrs. Bragan's purpose was to attempt to receive or intercept any damaging or unfavorable information about Chiaramonte which could be used to discredit him or Southern.

"Subsequent to the above events, respondent, from time to time, met with Bragan, Hayes and a Mr. Laurence Hampton, who was the general administrator at Clinton Hospital. Hayes testified that a number of the conversations at these meetings centered upon the possibility of simulating some sort of airplane crash at or near the proposed

site of Chiaramonte's new hospital. Flying high upon this wing and a prayer, respondent hoped to demonstrate the relative danger of the proposed hospital site in that it lay under the flight path of at least one of the runways of the nearby Andrews Air Force Base.

"Perhaps swayed by the sheer nonsense of such an idea, and not satisfied with the information received by Mrs. Bragan, respondent, still undaunted, went on to pursue more viable methods in attempting to tarnish Chiaramonte. On August 21, 1974, respondent met with Bragan and Mr. Frederick E. Davis (Davis), who represented himself to the respondent as being Bragan's brother. In fact, Davis was an undercover Maryland State Police officer. This meeting took place in Trader Vic's Television Sales and Service store, owned by respondent and located in Hillcrest Heights, Maryland.

"At that meeting, Bragan and Davis stated that they had stolen from Chiaramonte's office a letter written by Chiaramonte to his attorney, Paul Nussbaum (Nussbaum). They presented the document to respondent, who immediately called Hayes. Shortly thereafter, respondent and Hayes met at the Pagoda Seven Restaurant (Pagoda Seven) in Hillcrest Heights, Maryland.

"Bragan and Davis followed respondent to the Pagoda Seven and conversed with respondent after he had talked to Hayes. Respondent and Hayes agreed that an illegal entry into Chiaramonte's office was necessary. It was then that respondent conveyed to Bragan and Davis that he and Hayes wanted them to break into Chiaramonte's office. Bragan and Davis were instructed to concentrate their search for materials relating to Nussbaum, Rental Securities, a business operated by Chiaramonte, and Louis Schmidt, a Special Assistant Attorney General in the Maryland Department of Health.

"Approximately two hours after the conversation at the Pagoda Seven, in the early morning of August 22, 1974, respondent received a telephone call at his home. This call was from Bragan who stated that he and Davis were in Chiaramonte's office. Bragan told respondent that they had two documents purportedly signed by Chiaramonte and addressed to Schmidt. Bragan was advised to meet respondent at Schuler's Restaurant (Schuler's) in Clinton, Maryland.

"A short time later, around 1:15 a.m., on August 22, 1974, respondent once again met with Bragan and Davis. This gathering occurred on the Seven-Eleven Store parking lot adjacent to Schuler's. Bragan told respondent that he and Davis had the letters addressed to Schmidt and other materials stolen from Chiaramonte's office. Bragan maintained that he and Davis would not turn the documents over to respondent until they had been paid Two Thousand Five Hundred Dollars ($2,500.00).

"Pursuant to this demand, respondent called Hayes who directed that all parties concerned meet later that morning at Clinton Hospital. At that location, Hayes gave to respondent a check in the amount of One Thousand Five Hundred Dollars ($1,500.00). Respondent, in turn, gave the check to Bragan, who displayed it to Davis. Davis then presented to Hayes the documents which were ostensibly stolen from Chiaramonte's office, including the letters addressed to Schmidt.

"The panel further finds that none of the documents Bragan and Davis represented as being stolen were, in fact, stolen. Just as they were fabricated so was the breaking into Chiaramonte's office fictionalized. Actually, Bragan and Davis were calling from a phone located in the Forestville barracks of the Maryland State Police when they phoned respondent to inform him of the breaking and entering.

## "RECOMMENDATION OF THE COURT

"Based upon that which has been presented above and that which is to follow, the panel respectfully recommends that disbarment be the proper mode of discipline imposed upon respondent.

## "REASONS

"It is apparent that respondent violated the following Disciplinary Rules of the Code of Professional Responsibility:

1. Disciplinary Rule 1-102:
   '(A) A lawyer shall not:
   > (1) Violate a Disciplinary Rule.
   > (2) Circumvent a Disciplinary Rule through actions of another.
   > (3) Engage in illegal conduct involving moral turpitude.
   > (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
   > (5) Engage in conduct that is prejudicial to the administration of justice.
   > (6) Engage in any other conduct that adversely reflects on his fitness to practice law.'

"The panel finds that respondent participated in a conspiracy and a solicitation to commit a felony, the storehousebreaking of Chiaramonte's office. The fact that the storehousebreaking was never really committed does not discount the fact that there was a conspiracy and solicitation. The two most essential elements of a conspiracy are an agreement between two or more people to violate the law and an overt act in furtherance of that agreement. Respondent and Hayes agreed that there must be a break in of

Chiaramonte's office. The overt act requirement was satisfied when respondent solicited Bragan and Davis to commit the storehousebreaking. The solicitation, in and of itself, is sufficient illegal conduct involving moral turpitude to warrant disbarment. Furthermore, respondent compounded his reprehensible demeanor by accepting and paying for the ostensible fruits of the solicited crime. This panel cannot and will not tolerate such conduct by a member of the Maryland Bar. Ethical Consideration 1-5 succinctly states our feelings:

> 'EC 1-5 A lawyer should maintain high standards of professional conduct and should encourage fellow lawyers to do likewise. He should be temperate and dignified, and he should refrain from all illegal and morally reprehensible conduct. Because of his position in society, even minor violations of law by a lawyer may tend to lessen public confidence in the legal profession. Obedience to law exemplifies respect for law. To lawyers especially, respect for the law should be more than a platitude.'

2. Disciplinary Rule 7-102(A) (7) (8):

> '(A) In his representation of a client, a lawyer shall not:
>
>> (7) Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent.
>>
>> (8) Knowingly engage in other illegal conduct or conduct contrary to a Disciplinary Rule.'

"Once again, it is clear that respondent conspired with his client Hayes to concoct an illegal entry into Chiaramonte's office.

"In conclusion, the panel recommends disbarment

in order that the integrity of the legal profession in this state may not be further eroded by the actions of the respondent. Also, we are convinced disbarment is necessary for the protection of the public who rely upon lawyers to render legal services in a competent and honest manner. . ."

Moreover, we agree with the panel recommendation that disbarment is the proper sanction in view of the gravity of Edwards' misconduct.

*It is so ordered.*